Filed 2/28/19

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO ALVAREZ,<br><br>    Defendant and Appellant. | D074457<br><br>(Super. Ct. No. RIF1506265) |

APPEAL from a judgment of the Superior Court of Riverside County, Elaine M. Kiefer, Judge. Affirmed.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Alana Butler and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts 1, 3, and 4 of the Discussion.

After consuming alcohol, marijuana and cocaine, defendant Eduardo Alvarez drove through traffic at high speeds, ran a red light and broadsided another car, killing its passenger. A jury convicted him of second degree murder (Pen. Code, § 187) and other related charges.[1] He appeals only his murder conviction, claiming: (1) insufficient evidence supported a reasonable finding of implied malice; (2) the court should have instructed jurors on gross vehicular manslaughter while intoxicated as a lesser included offense; and (3) he was prejudiced by prosecutorial misconduct during rebuttal argument. He argues these errors individually and cumulatively compel reversal. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 9, 2015, Alvarez got behind the wheel of his Nissan sedan after consuming alcohol, cocaine, and marijuana. As he drove through Corona on a clear night, witnesses saw him weave in and out of traffic, pass cars at unsafe speeds, and use the shoulder to run a red light. Continuing eastbound on 6th Street toward the intersection at Promenade Avenue, Alvarez approached another red light. He swerved into the right turn lane to avoid cars stopped at the light and barreled into the intersection at 83 to 100 miles per hour (m.p.h.).

At that very moment, Jacob G. driving a Mazda sedan was turning left from Promenade Avenue onto eastbound 6th Street. He had a green light. Alvarez broadsided the Mazda with enough force to push its passenger side frame inwards three feet and

---

[1]     Further statutory references are to the Penal Code unless otherwise indicated.

2

cause Jacob's car to continue traveling 100 feet. The impact killed the Mazda's passenger, Courtney F., and injured Jacob.

After the collision, Alvarez initially admitted having a red light but then claimed his light was green. He refused to answer questions and tried to resist medical treatment. A blood draw revealed he had a blood alcohol level of 0.18 to 0.19 percent, indicating he had consumed at least six beers. He also had cocaine and THC (tetrahydrocannabinol) metabolites in his system. These suggested he had ingested alcohol and cocaine together and used marijuana shortly before driving.

Corona police officers recovered an unopened package of unisex synthetic urine from the console of Alvarez's Nissan. Evidence at trial indicated that Alvarez worked as a medical equipment delivery driver and had to randomly submit to a urine drug test pursuant to federal regulations. He had received job training on the effects of impaired driving, and his company had a zero-tolerance policy for driving while impaired.

The Riverside County District Attorney charged Alvarez by amended information with Courtney's murder (§ 187, subd. (a), count 1),[2] driving under the influence causing great bodily injury to Jacob (Veh. Code, § 23153, subd. (a), count 2), driving with blood alcohol level of 0.08 causing bodily injury to Jacob (Veh. Code, § 23153, subd. (b), count 3), and driving under the combined influence of alcohol and drugs causing injury to

---

[2]     The Supreme Court validated this theory of implied malice murder in *People v. Watson* (1981) 30 Cal.3d 290, 301 (*Watson*). Implied malice murder involving drunk driving is now "colloquially known as a *Watson* murder." (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 677 (*Wolfe*).)

3

Jacob (Veh. Code, § 23153, subd. (f), count 4). As to counts 2 through 4, the amended information further alleged that Alvarez personally inflicted great bodily injury on Courtney within the meaning of sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8).

At trial, Alvarez's main defense was that the collision was a "horrible accident" but not murder because he did not act with implied malice. He urged the jury to convict on counts 2 through 4 and return a true finding on the great bodily injury enhancement, but acquit him of murder.

Instead, the jury convicted Alvarez as charged and found all the allegations true. At sentencing, the court selected count 2 as the principal count and imposed the middle term of two years. It imposed an indeterminate term of 15 years to life on count 1, to run consecutively, and stayed the sentences for counts 3 and 4 and the enhancements pursuant to section 654.

## DISCUSSION

Alvarez raises three main challenges to his murder conviction: sufficiency of the evidence as to implied malice, instructional error, and prosecutorial misconduct during closing arguments. We address these contentions in turn before dealing with his remaining claim of cumulative error.

1.      *Sufficiency of the Evidence*

Alvarez argues there is insufficient evidence of implied malice to sustain his murder conviction. He concedes the evidence is sufficient to support a finding of gross vehicular manslaughter while intoxicated, but contends "[n]o rational juror could have

4

found proof beyond a reasonable doubt that Alvarez actually appreciated the danger of his conduct and consciously disregarded that danger."  We disagree.

"In reviewing the sufficiency of the evidence, we must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Wolfe*, *supra*, 20 Cal.App.5th at p. 681.)  "It is the jury, not an appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*Ibid.*)  Accordingly, we do not substitute our judgment for that of the jury or reverse "merely because the evidence might also support a contrary finding." (*Ibid.*)

A second-degree murder conviction requires malice aforethought.  (§ 187, subd. (a).)  Malice may be either express or implied.  (§ 188.)  "A person who, knowing the hazards of drunk driving, drives a vehicle while intoxicated and proximately causes the death of another may be convicted of second degree murder under an implied malice theory." (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1112 (*Batchelor*).) In validating this theory of murder, the Supreme Court cautioned that it should not be routinely prosecuted in vehicular homicide cases.  (*Watson*, *supra,* 30 Cal.3d at p. 301.)

" 'Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger.' " (*Wolfe*, *supra*, 20 Cal.App.5th at p. 681, citing *People v. Elmore* (2014) 59 Cal.4th 121, 133.)  Unlike gross negligence, implied malice "depends upon a determination that the defendant *actually appreciated* the risk involved,

5

i.e., a subjective standard." (*Watson*, *supra*, 30 Cal.3d at pp. 296−297; *Batchelor*, *supra*, 229 Cal.App.4th at pp. 1112−1113.) In other words, "[i]t is not enough that a reasonable person would have been aware of the risk." (*People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*).) As one court put it, "the state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifferences to the consequences [i.e., gross negligence] is simply, 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987−988 (*Olivas*).)

Although implied malice requires *actual* awareness of the risk created, it does not require proof "by an admission or other direct evidence of the defendant's mental state." (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697.) "[L]ike all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Ibid.*)

In *Watson*, the Supreme Court considered whether there was probable cause to allow a murder charge to proceed to trial in a vehicular homicide case based on the preliminary hearing evidence. The defendant had driven his car to a bar alone, knowing he would have to drive it later. (*Watson, supra,* 30 Cal.3d at p. 300.) Leaving the bar with a blood alcohol level of .23 percent, he ran a red light and narrowly avoided a collision by skidding to a halt. He sped off at high speeds (84 m.p.h.) and struck a car at the next intersection, killing two. (*Id.* at p. 301.) These facts were considered sufficient for a murder charge. (*Ibid.*)

6

Post-*Watson*, "appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol." (*Wolfe*, *supra*, 20 Cal.App.5th at p. 682 [collecting cases].) These cases have generally relied on some or all of the factors present in *Watson*: " '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*Id.* at pp. 682−683.) However, "nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary" to find implied malice; *Watson* "deliberately declin[ed] to prescribe a formula . . . , instead requiring a case-by-case approach." (*Olivas*, *supra*, 172 Cal.App.3d at pp. 988, 989.)

For example, in *Olivas* there was sufficient evidence of implied malice where a defendant "had consumed enough PCP to impair his physical and mental faculties"; "drove at extremely high speeds through city streets for a relatively lengthy period of time"; and was subjectively aware of the risk he posed to other drivers given his collision with one car, near misses with two others, and deliberate avoidance of pursuing officers. (*Olivas*, *supra*, 172 Cal.App.3d at p. 989.) This was sufficient even absent "proof that Olivas took PCP knowing he would later drive." (*Ibid.*)

*Moore* found sufficient evidence of implied malice where a defendant "drove 70 miles per hour in a 35-mile-per-hour zone, crossed into the opposing lane traffic, caused oncoming drivers to avoid him, ran a red light, and struck a car in the intersection without even attempting to apply his brakes." (*Moore*, *supra*, 187 Cal.App.4th at p. 941.) These

7

actions "went well beyond gross negligence"; the defendant "acted with wanton disregard of the near certainty that someone would be killed." (*Ibid.*)

More recently, *Wolfe* found substantial evidence of implied malice as to a defendant who drove home from her neighborhood bar and killed a pedestrian. (*Wolfe*, *supra*, 20 Cal.App.5th at p. 683.) Nearly 20 years before the accident, she pled guilty to driving under the influence in another state and attended a 90-minute presentation on impaired driving. (*Id.* at pp. 677, 683.) Five years before the accident, she renewed her California license and had to acknowledge she could be charged with murder if she drove impaired. (*Ibid.*) Further evidence of her subjective awareness was found in her level of intoxication (four times the legal limit), inability to keep her car within designated lanes, the circumstances of the collision itself, and her flight from the crime scene. (*Id.* at pp. 683−684.)

With these guideposts in mind, we conclude there is sufficient evidence to support a reasonable finding of implied malice here. As we explain, from his job training and post-collision admissions to police the jury was entitled to conclude that Alvarez was subjectively aware of the danger to human life. It could also reasonably find he consciously disregarded that known danger based on the manner in which he drove.

Alvarez was hired as a delivery driver for a medical supply company in November 2014, less than a year before the collision. His supervisor testified at trial. All drivers had to complete both a new-hire orientation and driver orientation; they also undergo annual training. The company gave Alvarez about two weeks of orientation and training when he started. He had two full days alone in a quiet office to review the manuals

8

before being tested on the contents. A 10-page packet among the 120 pages of materials covered "Drug and Alcohol Symptoms and Effects"—i.e., the effects of alcohol on driver reaction time and attentiveness. After reviewing these materials, Alvarez took a multiple choice test and scored 100 percent.

During his first week at work, Alvarez had to watch two videos on safe driving and the effects of driving while impaired. A one hour video on distracted driving mentioned alcohol impairment fourt to six times; a 30-minute video on defensive driving raised the topic two to four times. A still frame from one video warned, "Only time will sober you up. You must wait at least one hour per drink before driving." In discussing the dangers of aggressive driving, one of the videos cautioned against "following too closely, speeding, making unsafe lane changes, and failing to signal to change lanes." It also described how excessive speeding could result in a fatality. After watching the videos, Alvarez had to take online tests. He received a certification for successfully completing both tests.

As a medical equipment driver, federal industry regulations subjected Alvarez to random drug testing, usually every six months. The company would give him a slip at the start of his shift to immediately report to a clinic where he would take a urine test for alcohol, marijuana, and cocaine. Refusal to take a drug test would result in automatic termination.

These orientation materials and Alvarez's test scores support a finding that he was subjectively aware of the risk to human life posed by driving impaired. (See *Wolfe*, *supra*, 20 Cal.App.5th at p. 683 [jury could infer subjective awareness from educational

9

program on impaired driving decades before collision and warning on DMV form five years before collision]; *People v. Murray* (1990) 225 Cal.App.3d 734, 745 [jury could infer subjective awareness from alcohol classes taken three years before collision, even if evidence might not establish awareness of course material with certainty].) Alvarez's trainings nine months before the collision were more recent than the programs cited in *Wolfe* and *Murray*. Moreover, officers recovered an unopened packet of synthetic unisex urine from the console of Alvarez's car. From this, the jury could infer Alvarez understood his training well enough at the time of the collision that he stood ready to provide a false urine sample if asked to drug test on a day he was driving impaired.

The evidence also supports a finding that on August 9, 2015, Alvarez deliberately drove in conscious disregard of the known risk to human life. (*Wolfe*, *supra*, 20 Cal.App.5th at p. 683.) The facts are not in dispute. Alvarez drove with a blood alcohol level of .18 or .19 percent, or the equivalent of at least six beers in his system. He also had THC metabolite and cocaine metabolite in his bloodstream; marijuana can reduce focus and slow response time, while cocaine can increase risk-taking behavior. Because marijuana leaves the blood quickly, he must have ingested it recently before driving. Combining alcohol and multiple drugs compounds their effects. When presented with a hypothetical, the toxicologist opined that someone with Alvarez's test results would be driving impaired.

Three drivers observed Alvarez driving extremely recklessly just before the collision. He sped past Lorraine S. so quickly she felt her car shake. He came to a hard stop at a red light, suggesting he knew he should stop on red, then wove through traffic

10

once the light turned green. He next passed Wendy G. "really fast," cut in front of her, and switched lanes twice more. Benno W. saw him travel at unsafe speeds, swerve between cars, go onto the shoulder to bypass two cars, and blow through a red light.

Pedestrian Osama H. saw what came next. The victim's car had a green light and started turning left from Promenade onto 6th Street. Alvarez approached a solid red light on 6th, swerved to the right turn lane to go around two cars that were stopped at that light, and barreled through the intersection "like a bat out of hell." In broadsiding the victim's car, Alvarez's car left a three-foot indentation on the passenger side. The accident investigator testified that Alvarez ran the red light while traveling between 83 and 100 m.p.h.; the speed limit was 45.[3] Alvarez hit the victim's car with such force that it traveled over 100 feet post-impact. Given his knowledge of the effects of driving impaired, a jury could reasonably infer he consciously disregarded the risk to human life by driving in such a dangerous manner.

Implied malice is further supported by Alvarez's conduct immediately after the collision. He initially told Corona Police Officer Carlos Gutierrez that he "had a red light" when the accident occurred. He quickly changed his story, claiming the light was green. To the extent Alvarez suggests he did not think through the risks before getting behind the wheel, that "stands in contrast to the evidence that immediately after the

---

[3] Using surveillance video of the collision from a nearby business, the investigator estimated Alvarez's speed to be between 83 and 124 m.p.h. Taking into account the physical evidence, he opined that Alvarez was traveling between 83 and 100 m.p.h. at the time of impact.

collision, defendant *knew* he had just run a red light." (*People v. Hicks* (2017) 4 Cal.5th 203, 217−218 (*Hicks*).) "That fact that he was aware, immediately after the collision, that he had run a red light is particularly noteworthy; it strongly supports the conclusion that defendant acted knowingly and with conscious disregard of any danger." (*Id.* at p. 217.) Once help arrived, he actively resisted officers' instructions and medical treatment, "again proving his ability to make decisions (albeit poor ones) and to act with intentionality." (*Ibid.*)

"The question of implied malice is to be decided in light of all the circumstances." (*Moore*, *supra*, 187 Cal.App.4th at p. 942.) Alvarez argues that there is no evidence "he knew he would later drive when he began drinking" or that "he knew he was too drunk to drive when he got in the car." We recognize that this type of evidence has been considered in other cases. (See, e.g., *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1087; *Batchelor*, *supra*, 229 Cal.App.4th at p. 1115.) But as the People note, such evidence was "not a necessary predicate." (See *Moore*, at p. 942 [implied malice supported by reckless driving alone]; *Olivas*, *supra*, 172 Cal.App.3d at p. 988 ["While there is no evidence that Olivas took PCP knowing he would subsequently drive, nothing in *Watson* states that this alone precludes a finding of second degree murder"].) Alvarez's lack of prior drunk driving arrests is likewise not dispositive. "[T]here is no requirement of a 'predicate act,' i.e., a prior DUI or an alcohol-related accident necessary to establish implied malice." (*Johnigan*, at p. 1090.) Viewing the record as a whole, our facts are similar to those in *Moore* and *Olivas*. As in those cases, there is sufficient evidence of implied malice here.

12

We reject defendant's claim that this case, unlike *Olivas*, presented "no evidence of a collision or a near-miss before the fatal accident." A reasonable jury could infer that several collisions were narrowly avoided by others on the road. At an earlier red light, Lorraine saw Alvarez come to a "difficult stop" behind two cars because Alvarez "was going so fast." Wendy had to apply the brakes when Alvarez cut in front of her. Benno increased his following distance when he saw Alvarez speeding behind him in his rearview mirror, but Alvarez switched lanes twice and squeezed into that gap. He then drove onto the shoulder to run a red light without ever braking. Moreover, Alvarez's speeding, driving outside his lane, running red lights, and broadsiding a car without applying brakes all parallel conduct held sufficient in *Moore* to support a reasonable jury finding of implied malice. (*Moore*, *supra*, 187 Cal.App.4th at pp. 941−942 [rejecting defendant's claim he had no "near-miss" prior warnings].)[4]

In short, sufficient evidence supports Alvarez's murder conviction. A reasonable jury could find Alvarez drove impaired and in a reckless manner knowing he was endangering human life and consciously disregarding that risk. (*Olivas*, *supra*, 172 Cal.App.3d at p. 988.) Alvarez's claim that this case is "indistinguishable" from cases involving gross vehicular manslaughter while intoxicated does not convince us otherwise.

---

[4]     Alvarez attempts to distinguish *Moore* by arguing the defendant there showed no remorse after the collision. The trial judge reasonably construed Alvarez's remarks to responding officers in the same manner, stating he showed "no remorse" or "any type of concern for anyone but himself." Moreover, *Moore* mentioned the defendant's apparent lack of remorse in outlining the facts, not in evaluating whether there was sufficient evidence of implied malice. (*Moore*, *supra*, 187 Cal.App.4th at pp. 940, 941−942.)

13

As the Supreme Court recognized in *Watson*, "a defendant may be charged with second degree murder upon facts which also would support a charge of vehicular manslaughter." (*Watson*, *supra*, 30 Cal.3d at p. 299.) That the evidence might also support conviction of a different uncharged offense does not affect our analysis on sufficiency-of-the-evidence review.

2.      *Instructional Error*

Defense counsel requested jury instructions on involuntary manslaughter, gross vehicular manslaughter while intoxicated, and simple vehicular manslaughter while intoxicated as lesser included offenses of murder on count 1. The prosecution objected, and the trial court denied the request. During closing arguments, defense counsel argued that Alvarez was guilty of only manslaughter, but the prosecutor had chosen to charge him with murder. On appeal, Alvarez argues the court erred in failing to instruct the jury that gross vehicular manslaughter while intoxicated is a lesser included offense of implied malice murder. We conclude the instruction was properly denied.

"[E]ven absent a request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 118 (*Birks*).) We independently review whether the court erred by failing to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

There are two tests for determining whether an uncharged crime is a lesser included offense. "Under the elements test, a court determines whether, as a matter of law, the statutory definition of the greater offense necessarily includes the lesser offense."

14

(*People v. Parson* (2008) 44 Cal.4th 332, 349.) This test is satisfied if " 'all legal elements of the lesser offense are also elements of the greater.' " (*People v. Robinson* (2016) 63 Cal.4th 200, 207 (*Robinson*).) "Under the accusatory pleading test, a court reviews the accusatory pleading to determine whether the facts actually alleged include all of the elements of the uncharged lesser offense; if it does, then the latter is necessarily included in the former." (*Parson*, at p. 349; see *Birks*, *supra*, 19 Cal.4th at pp. 117−118.)

Alvarez concedes gross vehicular manslaughter while intoxicated is not a lesser included offense of murder under the statutory elements test, as it requires additional elements (use of a vehicle and intoxication) not required for murder. (*People v. Sanchez* (2001) 24 Cal.4th 983, 988−989.) Nevertheless, he claims it *is* a lesser included offense under the accusatory pleading test. We disagree.

The amended information tracked the language of section 187, subdivision (a) in alleging Alvarez "did willfully and unlawfully murder Courtney F., a human being." "When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*Robinson*, *supra*, 63 Cal.4th at p. 207; see *People v. Shockley* (2013) 58 Cal.4th 400, 404 ["because the information charging defendant with lewd conduct simply tracked section 288(a)'s language without providing any additional factual allegations, we focus on the elements test"].)

Notwithstanding this rule, Alvarez urges us to apply the "expanded" accusatory pleading test articulated in *People v. Ortega* (2015) 240 Cal.App.4th 956, 967 (*Ortega*).

15

The defendant in *Ortega* was charged with forcible sexual penetration (§ 289, subd. (a)(1)(A)) based on evidence of digital penetration. (*Id.* at pp. 960−961.) On appeal he argued the court should have instructed jurors that sexual battery was a lesser included offense of forcible sexual penetration. The court agreed. Although it was not a lesser included offense under the elements test, it was such under "an expanded accusatory pleading test." (*Id.* at p. 967.) The court reasoned that "evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Ibid.*) It believed this rule naturally followed a criminal defendant's due process right to be prosecuted only on the noticed charges. (*Id.* at pp. 968−969.)

The People argue *Ortega* was wrongly decided or inapplicable where the alleged lesser included offense requires a different mens rea. Because we agree on the broader first point, we decline to follow *Ortega*.

"Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense— we consider *only* the pleading for the greater offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036 (*Montoya*).) Accordingly, unlawful taking of a vehicle was not a lesser included offense of carjacking in *Montoya* because the charging document did not include the "requisite allegations" for unlawful taking. (*Ibid.*) In subsequent cases the Supreme Court has reiterated that "[t]he trial court need only examine the accusatory pleading" in applying the accusatory pleading test. (*People v. Smith* (2013) 57 Cal.4th

16

232, 244 [further noting the test "does not require or depend on an examination of the evidence adduced at trial"]; *People v. Banks* (2014) 59 Cal.4th 1113, 1160.)

Two recent reported decisions have relied on *Montoya* to reject *Ortega*'s "expanded" accusatory pleading test.[5]  In *Macias*, *supra*, 26 Cal.App.5th 957, a defendant was charged with and convicted of using a minor for purposes of posing for sexual conduct (§ 311.4, subd. (c)) based on evidence he had surreptitiously filmed his partner's daughter.  He claimed the trial court should have instructed jurors that unauthorized invasion of privacy was a lesser included offense under *Ortega*'s "expanded" accusatory pleading test.  (*Id.* at p. 961.)  The court rejected *Ortega*'s test as "contrary to *Montoya*"—a case *Ortega* did not cite— and "not . . . followed by any published cases."  (*Id.* at p. 964.)

Squarely on point is the case that followed *Macias*: *Munoz*, *supra*, 31 Cal.App.5th 143.  After a jury convicted a defendant of *Watson* murder, he raised the same challenge raised here to the court's refusal to instruct jurors on gross vehicular manslaughter while intoxicated as a lesser offense.  Rejecting that claim, the *Munoz* court highlighted the rule under *Montoya*: "when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense."  (*Id.* at

---

5    We asked the parties to submit supplemental letter briefs addressing *People v. Macias* (2018) 26 Cal.App.5th 957 (*Macias*).  Before those briefs were due, a decision issued in *People v. Munoz* (2019) 31 Cal.App.5th 143 (*Munoz*).  The parties' supplemental briefs address both *Macias* and *Munoz*.

17

p. 156.)  Because *Ortega* failed to reconcile this rule and had been rejected by the only published case citing it (*Macias*, *supra*, 26 Cal.App.5th 957), the *Munoz* court declined to follow *Ortega*.  (*Munoz*, at pp. 157–158.)

The People urge us to follow *Macias* and *Munoz* while Alvarez maintains that *Ortega* provides the correct rule.  We think the People have the better argument. *Montoya* disapproved of *People v. Rush* (1993) 16 Cal.App.4th 20, which considered evidence from the preliminary hearing in applying the accusatory pleading test.  (*Id.* at p. 27; *Montoya*, *supra*, 33 Cal.4th at p. 1036, fn. 4; see *Macias*, *supra*, 26 Cal.App.5th at p. 964 [discussing *Montoya*'s disapproval of *Rush*].)  *Ortega* did not cite *Montoya* or attempt to reconcile its analysis.  As an intermediate appellate court, we are required to follow Supreme Court precedent.  (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We agree with *Munoz* that, consistent with that precedent, "we are not to look beyond the language of the accusatory pleading itself in assessing lesser included offenses."  (*Munoz*, *supra*, 31 Cal.App.5th at p. 158.)

Alvarez attempts to distinguish *Montoya* as a multiple conviction case, i.e., where a defendant is charged with and convicted of both the greater and lesser offenses.  He argues that an "expanded" accusatory pleading test is more appropriate "in an uncharged lesser conviction case like this one."  We do not read *Montoya* so narrowly.  The court articulated the general standard for the accusatory pleading test before considering its application in a multiple conviction case.  (*Montoya*, *supra*, 33 Cal.4th at

18

pp. 1035−1036.)[6]  "Thus, *Montoya* intended its rule not only to apply in the context of multiple convictions, but also in the context of determining whether instructions on a lesser offense were warranted." (*Munoz, supra*, 31 Cal.App.5th at p. 158.)  Indeed, *Macias* and *Munoz*, both single-conviction cases, undermine Alvarez's claim.

Although we could simply rely on *Munoz*, there is also a conceptual problem with *Ortega*. In *Birks, supra*, 19 Cal.4th 108, the Supreme Court overruled *People v. Geiger* (1984) 35 Cal.3d 510 (*Geiger*) and explained that a defendant has no unilateral right to instructions on lesser *related* offenses not necessarily included in the charge.  A different rule "would interfere with prosecutorial charging discretion, essentially allowing the defendant, not the prosecutor, to choose which charges are presented to the jury for decision . . . ." (*Hicks, supra*, 4 Cal.5th at p. 211 [discussing *Birks*].)

Critically, "*Birks* makes clear that the goal of enabling a jury to return the most accurate verdict that the evidence supports *does not require that every possible crime a defendant may have committed be presented to the jury as an alternative*.  Rather, a jury need only be instructed on offenses that the prosecution *actually charged* either explicitly or implicitly (because they were necessarily included within explicitly charged offenses)." (*Hicks, supra*, 4 Cal.5th at p. 211, italics added.)

---

6      The Supreme Court later held that courts may consider "only the statutory elements in deciding whether a defendant may be convicted of multiple *charged* crimes." (*People v. Reed* (2006) 38 Cal.4th 1224, 1231.)

*Ortega* focuses on language in *Birks* that sua sponte instruction on lesser included offenses "prevents either party whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other." (*Ortega*, *supra*, 240 Cal.App.4th at p. 970, citing *Birks*, *supra*, 19 Cal.4th at p. 119.) But this rule applies to necessarily *included* lesser offenses. *Ortega*'s "expanded" accusatory pleading test blurs the line between lesser included offenses, for which sua sponte instruction may be required, and lesser *related* offenses, for which it is not. It also overlooks that *Birks* relied on the notice provided "in *the accusatory pleading itself*" to require sua sponte instruction on lesser *included* offenses:

> "Where the evidence warrants, the rule ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in *the accusatory pleading itself* and are thus closely and openly connected to the case." (*Birks*, *supra*, 19 Cal.4th at p. 119.)

The rule as to lesser included offenses " 'encourages a verdict, *within the charge chosen by the prosecution*, that is neither "harsher [n]or more lenient than the evidence merits." ' " (*Hicks*, *supra*, 4 Cal.5th at p. 210, italics added.) In our view, this guiding Supreme Court precedent does not provide a basis to extend this principle to related charges *not* chosen by the prosecution.

As a general matter, a single set of facts may support several related criminal charges. In drunk driving cases like this one, "a defendant may be charged with second degree murder upon facts which also would support a charge of vehicular manslaughter." (*Watson*, *supra*, 30 Cal.3d at p. 299.) It is the prosecutor's role to decide what charges (and thereby what lesser included offenses) are presented to the jury. (*Hicks*, *supra*, 4

20

Cal.5th at p. 211; *Birks*, *supra*, 19 Cal.4th at p. 134.) *Ortega*'s "expanded" accusatory pleading test would interfere with this charging authority by requiring sua sponte instruction on lesser related offenses, effectively reviving the *Geiger* rule in select cases.

Alvarez sees no problem with this outcome in cases like his where the district attorney initially charged and provided sufficient evidence of *both* charges at the preliminary hearing. Only later did the prosecutor opt to amend the information and charge Alvarez solely with *Watson* murder. But we see no principled way to carve out such cases from *Birks*. (See *Birks*, *supra*, 19 Cal.4th at p. 131 [noting that the *Geiger* rule requiring instruction on "related" offenses had proven unworkable across diverse types of cases and fact patterns]; see also *Hicks*, *supra*, 4 Cal.5th at p. 211 [rejecting defendant's claim that where "the prosecution *in fact charged the lesser related offense*, . . . the concern we had in *Birks* about interfering with prosecutorial charging discretion is not implicated"].) To adopt Alvarez's gloss on *Ortega*, every time evidence at the preliminary hearing was found to support two related charges, the accusatory pleading test would require sua sponte instruction on the lesser notwithstanding the prosecutor's ultimate decision to charge only the greater crime. This result necessarily interferes with a prosecutor's discretion to decide what charges to bring and try. (*Birks*, at p. 134; *Hicks*, at p. 211.)

Focusing on the amended information alone (*Macias*, *supra*, 26 Cal.App.5th at p. 964; *Munoz*, *supra*, 31 Cal.App.5th at p. 158), gross vehicular manslaughter while intoxicated is a lesser related offense but not a lesser included offense of *Watson* murder. "[I]nstruction on a lesser related offense is proper only upon the mutual assent of the

21

parties." (*People v. Taylor* (2010) 48 Cal.4th 574, 622 [citing and declining to reconsider *Birks*].) "Here, because the prosecutor objected to the instruction on the crime of [gross vehicular manslaughter while intoxicated], the trial court correctly denied defendant's request." (*Ibid*.)

3.      *Ineffective Assistance of Counsel as to Closing Remarks by Prosecutor*

During closing arguments, defense counsel argued the collision was a "horrible accident" but not murder. The prosecutor responded in rebuttal that it was no accident. Although Alvarez did not *intend* to kill Courtney, "he did things in such a dangerous, horrific way that he had a conscious disregard for anyone else on the road. If they got in his way they could die. And she did." Pointing to his failure to use ordinary care, the prosecutor remarked,

> "Are you going to say to people that it's okay to drive and drink and dope and drive like he did? You're going to label that an accident? What kind of world would we live in if this kind of person gets a license to kill?"

Alvarez contends this statement constituted prejudicial prosecutorial misconduct. But defense counsel's failure to object and seek a curative admonishment forfeits his claim by direct appeal. (*People v. Gamache* (2010) 48 Cal.4th 347, 372 ["As no objection was made, this argument is forfeited."]; *People v. Panah* (2005) 35 Cal.4th 395, 463 (*Panah*) ["Defendant failed to object to any of these comments, or to seek a curative admonition, thus the claim is forfeited."].)

"There are two exceptions to this forfeiture:  (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been

22

insufficient to cure the harm occasioned by the misconduct." (*Panah*, *supra*, 35 Cal.4th at p. 462.) "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*Ibid.*) Although Alvarez maintains objecting would have been futile because "the bell could not be unrung," he offers no record support for that argument, rendering his claim forfeited. (*Id.* at p. 463; *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).)[7]

Of course, even where defense counsel failed to object to prosecutorial error at trial, a defendant " 'can [still] argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*Centeno*, *supra*, 60 Cal.4th at p. 674.) Because Alvarez makes that claim here, "[h]e bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing norms, and (2) counsel's deficiencies resulted in prejudice." (*Ibid.*; see *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216−217 (*Ledesma*).)

We first consider whether prosecutorial error occurred. Claiming it did not, the People suggest the prosecutor's remarks were fair comments on the evidence. Citing

---

7    Indeed, on our record, we believe a prompt objection and admonition to the prosecutor's brief rhetorical remarks would have cured the harm.

23

*People v. Shazier* (2014) 60 Cal.4th 109 (*Shazier*), Alvarez maintains the argument crossed the line and amounted to misconduct.

In *Shazier*, a prosecutor suggested over defense objection during his closing argument that jurors would face community disapproval unless they found the defendant to be a sexually violent predator (SVP). (*Shazier*, *supra*, 60 Cal.4th at pp. 143−145.) He told jurors they would soon be released from their oath of silence and might have difficulty explaining their verdict to family and friends if they failed to find defendant was an SVP. (*Id.* at p. 143.) This was misconduct. (*Id.* at p. 145.) "Because the specter of outside social pressure and community obloquy as improper influences on the jurors' fairness and objectivity is so significant, we cannot countenance argumentative insinuations that jurors may confront such difficulties if they make the wrong decision." (*Ibid.*; see *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149 [highlighting social ramifications risks garnering conviction for reasons irrelevant to individual guilt].) Along similar lines, a prosecutor may not " 'make arguments to the jury that give the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742 (*Redd*).)

As Alvarez puts it, the prosecutor's brief remarks here "appealed to the jurors' anger and fear about drunk-driving, their fear of what others would think about their verdict, and their desire to punish Alvarez." This was likely improper. (*Shazier*, *supra*, 60 Cal.4th at p. 145; *Redd*, *supra*, 48 Cal.4th at p. 743.) The "license to kill" remark both

24

compounds the improper inference and is separately problematic for suggesting Alvarez would walk free if the jury failed to convict. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1532.) Additionally, because the prosecutor's remark was made during rebuttal, "defense counsel had no opportunity to counter it with argument of [her] own. [Her] only hope of correcting the misimpression was through a timely objection and admonition from the court. Under these circumstances, we can conceive of no reasonable tactical purpose for defense counsel's omission." (*Centeno*, *supra*, 60 Cal.4th at p. 676.)

But even assuming counsel's performance was deficient, Alvarez does not meet his burden to show prejudice. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 693−694.) "Specifically, '[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " (*Ledesma*, *supra*, 43 Cal.3d at pp. 217−218.)

The challenged rhetorical questions amounted to a mere five lines out of four pages (112 lines) of rebuttal argument. Jurors were instructed that attorney remarks "are not evidence" and not to "let bias, sympathy, prejudice, or public opinion influence your decision." (CALCRIM Nos. 101, 104, 222.) Before they retired to deliberate, the court told them to "reach your verdict without any consideration of punishment." (CALCRIM No. 3550.) These same instructions (albeit accompanied by an admonition) minimized the concern in *Shazier* that the "jury's verdict was influenced by a misapplication of the

25

prosecutor's remarks." (*Shazier*, *supra*, 60 Cal.4th at pp. 150−151; see *People v. Dykes* (2009) 46 Cal.4th 731, 772 [" 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements' "].)

Moreover, given the totality of the evidence supporting a finding of implied malice (see section 1, *ante*), Alvarez does not meet his burden to show by a preponderance of the evidence a *reasonable probability* of a different outcome had defense counsel objected. (*Strickland*, *supra*, 466 U.S. at p. 694 ["A reasonable probability is a probability sufficient to undermine confidence in the outcome."]; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 [" ' "The proof . . . must be a demonstrable reality and not a speculative matter." ' "]; cf. *Centeno*, *supra*, 60 Cal.4th at p. 677 [reversing for failure to object to prosecutorial misconduct in "a very close case"].) Defense counsel was not constitutionally ineffective despite her failure to object to questionable remarks made by the prosecution during rebuttal.

4.      *Cumulative Error*

Alvarez argues his murder conviction should be reversed because the cumulative effect of errors rendered his trial fundamentally unfair. Because we have found a single error and ruled it harmless when considered separately, it follows that any cumulative effect of the claimed errors "does not warrant reversal of the judgment." (*People v. Jablonski* (2006) 37 Cal.4th 774, 825.)

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


NARES, Acting P. J.


GUERRERO, J.